597 F.2d 819
 In the Matter of the Arbitration between NATIONAL BULK
CARRIERS, INC., Petitioner-Appellee-Appellant,
and
PRINCESS MANAGEMENT COMPANY, LIMITED, Respondent-Appellee,
E. W. Westgate Co., Inc., Proposed Intervenor-Appellant.
Walter SOMMER, Petitioner-Appellee,
v.
NATIONAL BULK CARRIERS, INC., Respondent-Appellant.
 Nos. 779 to 781, Docket Nos. 78-7490, 78-7569 and 78-7629.
 United States Court of Appeals,
Second Circuit.
 Argued March 15, 1979.
Decided April 3, 1979.
 
 Abraham L. Pomerantz, New York City (William E. Haudek, Pomerantz, Levy, Haudek & Block, New York City, John W. Castles 3d, Eugene F. Bannigan, James M. Morrissey, Lord, Day & Lord, New York City, of counsel), for petitioner-appellee-appellant National Bulk Carriers, Inc.
 Richard Frank, New York City (Charles P. Axelrod, Richard Frank, P. C., New York City, of counsel), for respondent-appellee Princess Management Co., Ltd., and petitioner-appellee Walter Sommer.
 Edward A. Jaffe, Honolulu, Hawaii (Richard R. Clifton, Cades, Schutte, Fleming & Wright, Honolulu, Hawaii, Robert J. Kheel, Willkie, Farr & Gallagher, New York City, of counsel), for proposed intervenor-appellant E. W. Westgate Co., Inc.
 Before KAUFMAN, Chief Judge, GURFEIN, Circuit Judge, MISHLER, District Judge.*
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 On this appeal, we are once again confronted with "a classic example of a losing party seizing upon 'a pretext for invalidating (an) arbitration award,' " In re Arbitration between Andros Compania Maritima, S.A., and Marc Rich & Co. A.G., 579 F.2d 691, 702 (2d Cir. 1978). National Bulk Carriers, Inc. (NBC) lost a $2 million award in favor of Princess Management Co. (PMC) and immediately shifted the scene of battle from the halls of the American Arbitration Association to the United States District Court for the Southern District of New York. Finding no solace there, it has pressed onward to the Court of Appeals. Because we believe that NBC has completely failed in its quest to establish sufficient grounds under the Federal Arbitration Act to vacate the award, we affirm the judgment of the district court.
 
 I.
 
 2
 For many years, NBC has, through its affiliate, Princess Properties International (PPI),[1] operated a chain of "Princess" luxury hotels in Mexico, Bermuda, and the Bahamas. In January 1976, appellee Walter Sommer, then Chief Executive Officer of PPI, proposed that he be empowered to seek developers or hotel operators to whom NBC could license its "Princess" and "P" trademarks. NBC consented, and an agreement was drafted whereby Sommer would resign from PPI and, for a nominal sum, purchase PMC, then a dormant subsidiary of PPI. Prospects discovered by Sommer would be licensed directly by NBC, and PMC would operate the hotels for the licensee, remitting 25% Of its net profit to NBC. In addition, NBC would perform reservations and sales services for the licensee and pay PMC 10% Of the fees derived. In short, the parties expected to combine Sommer's experience as a hotelier with NBC's trademarks and reservations system to obtain an expanded chain of profitable resort hotels.
 
 
 3
 Sommer began searching for possible licensees shortly after the agreement was executed on March 1, 1976, and, by August, he had secured two prospects. E. W. Westgate Co. proposed to build a hotel in Hawaii called the Waikoloa Princess, and Mitsubishi International Corp. discussed transforming its Palm Springs hotel, the Canyon Inn, into the "Canyon Princess." Although PMC and Westgate concluded an agreement whereby Westgate would build the Waikoloa hotel and PMC would operate it, the Mitsubishi negotiations bogged down, apparently because Mitsubishi was concerned about the relationship between PMC and NBC and sought additional assurances that NBC would service the Canyon Princess on a par with the other members of the Princess chain.
 
 
 4
 Mitsubishi was not the only party having second thoughts about the PMC-NBC arrangements. By October 1976, NBC itself determined to terminate the March 1 agreement. Whether this decision resulted from violations by Sommer of his duties as an agent,[2] or whether NBC was merely unhappy with the bargain it had struck, was a hotly contested issue in the arbitration proceeding. But for whatever reason, NBC refused to grant Westgate a license for the Princess trademarks, and, in early November, it notified Sommer that their relationship was at an end.
 
 
 5
 PMC responded by demanding arbitration under paragraph 9 of the March 1 agreement,[3] claiming damages in excess of $2 million (later raised to $30 million) and, pursuant to the agreement, appointing as its arbitrator David Weicholz, Esq., a respected member of the New York Bar. NBC impleaded Sommer personally and counterclaimed for prior breach, designating Stuart Summit, Esq., also a distinguished lawyer, as its arbitrator. The American Arbitration Association named Hon. Isidore Dollinger, a retired Justice of the New York Supreme Court, to be the impartial arbitrator, and the arbitration proceedings began in July 1977. The hearings stretched over two months, comprising 22 days of testimony, 3500 pages of transcript, and more than 200 exhibits. In addition, the parties submitted lengthy post-arbitration memoranda.
 
 
 6
 Following oral argument, the arbitrators met on November 7, 14, and 22 to consider their award. At the third meeting, Weicholz and Dollinger concluded that NBC was liable to PMC in the amount of $2 million, and they signed an award to that effect the next day. Summit dissented, arguing (as NBC had throughout the proceedings) that Sommer had breached the agreement by engaging in outside hotel activities that conflicted with his duties to NBC and that, in any event, the evidence as to damages was too speculative to support any award, let alone a substantial one. In addition, Summit charged Weicholz and Dollinger with improper conduct during the course of the arbitrators' deliberations.
 
 
 7
 Summit's allegations concerning Weicholz and Dollinger provide the framework for this appeal. He asserted that
 
 
 8
 (1) at the third meeting, Dollinger abdicated his responsibility to exercise his independent judgment by announcing that he would sign an award for any sum between $1.5 million and $2 million, the amount to be chosen by whichever of Summit and Weicholz would first agree to an award in that range;
 
 
 9
 (2) at the second meeting, Weicholz claimed that NBC had offered PMC "one million, two, tax free" to settle before the arbitration began, although the record was devoid of evidence of such an offer, and none in fact had been made;
 
 
 10
 (3) Weicholz made repeated references to the wealth of D. K. Ludwig, NBC's sole shareholder. Ludwig's pioneering ventures in building a fleet of oil tankships have made him a leader in the world of finance.
 
 
 11
 Immediately after Summit filed his dissent, NBC commenced the instant action. The complaint repeated Summit's allegations and charged, in the language of § 10 of the Federal Arbitration Act, 9 U.S.C. § 10, that Weicholz and Dollinger had demonstrated such "evident corruption, misbehavior, and misconduct," and they had "so imperfectly executed their powers," that the award was void and should be vacated.[4] PMC denied the allegations and cross-moved to confirm the award.[5]
 
 
 12
 To determine what in fact had occurred during the arbitrators' deliberations, Judge Sand held an evidentiary hearing at which Summit, Weicholz, and Dollinger testified. In a careful and thoughtful opinion, the district judge found that NBC had failed to establish either abdication by Dollinger or improper conduct by Weicholz. Accordingly, he denied the motion to vacate and entered a judgment confirming the award.[6]
 
 II.
 
 13
 Because both of NBC's contentions on appeal concern statements made by the arbitrators at their three so-called "decisional meetings," it will be useful to describe briefly the progress of these deliberations. Early in the first meeting, Judge Dollinger announced that he did not believe NBC had just cause to terminate the agreement with PMC and, accordingly, that he regarded NBC's liability to PMC as established. Summit, of course, endeavored to persuade the neutral arbitrator to alter his views, but to no avail. Dollinger did agree that PMC's prospects for successfully negotiating a license agreement with Mitsubishi were too speculative to support an award of damages, but Waikoloa he deemed "a fait accompli." He told his colleagues that damages should be assessed for NBC's failure to consummate the Hawaiian deal,[7] and he asked them to come prepared with figures to the next meeting.
 
 
 14
 Weicholz complied with this request, but Summit did not. At the second meeting, the NBC arbitrator continued to maintain that his principal had breached for cause, and he refused to discuss damages. At the conclusion of the meeting his position was unchanged, while Weicholz urged an award of $6 or $7 million, based on both the Waikoloa and Canyon Inn projects. Dollinger repeated that liability was settled but that he would only award damages for the Hawaiian hotel, and he reiterated his request that the partisan arbitrators especially Summit come back with detailed figures on that basis. Sometime during this discussion, Weicholz commented about a pre-arbitration settlement offer. Summit did not believe such an offer had been made and said that he would check with his principals before the next meeting.
 
 
 15
 At the third meeting, Summit reported that NBC had never offered Summit "one million, two, tax free" to settle, nor, indeed, had any other formal settlement offer ever been made. Dollinger did not place reliance on the alleged "offer" and requested once again that Summit and Weicholz direct their discussion to the issue of damages.[8] NBC's arbitrator countered by asking Dollinger what his own views were, and Judge Dollinger responded that "the figure is a million and a half, no more than two million dollars." According to Dollinger's testimony at the hearing before Judge Sand, Summit then said there was no basis for such an award, but Dollinger replied that, based on the evidence in the arbitration, "those are the figures I obtained."
 
 
 16
 At this point, Weicholz entered the discussion with a request for an award of $4 million, still based in part on Canyon Inn. As he and Dollinger discussed this, Summit, for the first time, departed from absolute zero and suggested an award between $270,000 and $600,000. Neither Dollinger nor Weicholz considered this seriously, however, and Dollinger told PMC's arbitrator that he simply would not award damages for Canyon Inn. Finally, Weicholz said "under the circumstances, I'll take $2 million," and the award was signed.
 
 III.
 A.
 
 17
 Appellant asserts as established fact that Judge Dollinger, in announcing the range of damages he believed reasonable, stated that he would sign an award with whichever of his colleagues would first agree to a number between $1.5 million and $2 million. Indeed, Summit did testify to this effect. But Dollinger and Weicholz did not, and Judge Sand concluded on the basis of all the testimony that "Judge Dollinger was imposing no ultimata but was inviting and, indeed almost beseeching, discussion."
 
 
 18
 This finding is hardly clearly erroneous. See Fed.R.Civ.P. 52(a). Both Dollinger and Weicholz testified that they argued for a considerable period of time whether an award should be made for Canyon Inn before finally agreeing on $2 million for the Waikoloa transaction damages. Moreover, there can be no doubt that both arbitrators deemed this sum a reasonable valuation of the profits PMC lost through NBC's failure to license the Hawaiian hotel. All the testimony indicates that the two had been in substantial agreement on Waikoloa throughout the third meeting, differing only on Canyon Inn.
 
 
 19
 With this background, it is apparent that NBC's abdication claim is totally without substance. It is true, of course, that an arbitrator's duty is a personal one and may not be delegated. See American Arbitration Ass'n, Code of Ethics for Arbitrators in Commercial Disputes, Canon V(C) (1977). But we fail to comprehend how an arbitrator who made a careful evaluation of the evidence before him, accepted some claims and rejected others, and finally awarded damages he believed justified by the record can in any sense be said to have abdicated his duty to decide.[9] He was simply engaging in the hard-headed negotiations that so often form a central part of the arbitration process. The hallmarks of commercial arbitration are speed and pragmatism, See, e. g., Sobel v. Hertz, Warner & Co., 469 F.2d 1211, 1214 (2d Cir. 1972), and those values would be ill served by a hypertechnical second-guessing of the arbitrators' deliberative processes, Cf. Federal Commerce & Navigation Co. v. Kanematsu-Gosho, Ltd., 457 F.2d 387, 389-90 (2d Cir. 1972).
 
 B.
 
 20
 It is conceded on all sides that, at the second meeting of the arbitrators, Weicholz stated that NBC had offered to settle the dispute even before the arbitration began. This can hardly have come as a shock to Summit or Dollinger, for the record before the arbitrators was replete with references to possible settlements. Kenneth Scholl, an officer of NBC, had written a memorandum urging his superiors to terminate the PMC licensing agreement and settle with PMC "at somewhere between $500,000 and $1,000,000." And, during negotiations before NBC formally terminated the agreement, Scholl and Summit discussed a possible settlement for $2 million.[10] Evidence of both settlement proposals was introduced at the arbitration without objection by NBC.
 
 
 21
 In light of these circumstances, we cannot say that Judge Sand's finding that Weicholz's comment was most likely the result of a good faith error in recalling the testimony was clearly erroneous. To be sure, there was no indication that the specific figure.$1.2 million was ever discussed, nor was there any evidence of negotiations concerning the tax consequences of settlement. Thus, we accept NBC's contention that the statement "one million, two, tax free" is unsupported by the arbitration record. But it hardly follows that Weicholz must therefore have been endeavoring to introduce Ex parte information into the arbitrators' deliberations. As Judge Sand noted, it is a simple matter in oral discussions to confuse a reference to "one or two million" with one to "one point two million" or "one million, two." We need not decide whether this is what occurred, just as we need not decide why Weicholz claimed that the settlement would be tax free.[11] It is enough that Weicholz testified and Judge Sand obviously credited that the settlement comment was offhand and based on the evidence as he remembered it. On the record as a whole, we are simply not " 'left with the definite and firm conviction that a mistake has been committed,' " Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969), Quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); See, e. g., Van Alen v. Dominick & Dominick, Inc., 560 F.2d 547, 550 (2d Cir. 1977). Accordingly, under Fed.R.Civ.P. 52(a), we are bound to affirm.
 
 
 22
 Indeed, even had Weicholz purveyed Ex parte settlement information, we would still be inclined to confirm the award on the facts of this case. Weicholz's statement was made at the second meeting, well after Judge Dollinger had announced that he considered liability established,[12] and the Judge testified that he regarded the whole discussion as irrelevant. And even if Weicholz's statement might have had an impact on Dollinger, Summit reduced that effect by reporting at the third meeting that no offer like that described by Weicholz had been made. There is simply not any evidence of prejudice to NBC that would justify vacating the award. See Drayer v. Krasner, 572 F.2d 348, 352 (2d Cir.), Cert. denied, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978).
 
 C.
 
 23
 It is clear, then, that NBC's appeal must fail. Not only are the district court's findings far from clearly erroneous, but even on NBC's version of the facts the court below would properly have confirmed the award. Arbitration cannot achieve the savings in time and money for which it is justly renowned if it becomes merely the first step in lengthy litigation. See Necchi Sewing Machine Sales Corp. v. Necchi, S. p. A., 369 F.2d 579, 582-83 (2d Cir. 1966) (Kaufman, J., dissenting). It is for this reason that the criteria for vacating an award are so stringent, See 9 U.S.C. § 10, and only "clear evidence of impropriety" justifies denial of summary confirmation, Andros Compania Maritima, supra, 579 F.2d at 702. The judgment is affirmed.[13]
 
 
 
 *
 Chief Judge, United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 Although nominally separate entities, PPI and NBC both appear to be controlled by D. K. Ludwig, NBC's sole shareholder
 
 
 [2]
 Specifically, NBC charged that Sommer held an undisclosed interest in the Four Ways Inn, in Bermuda, which competed with NBC's Southampton Princess, and that he misused Southampton Princess purchase order forms for the benefit of Four Ways
 
 
 [3]
 Paragraph 9 provides:
 
 
 [9]
 ARBITRATION
 Any disagreement with respect to the terms of this Agreement shall be determined by arbitration in New York pursuant to the rules of the American Arbitration Association. NBC shall appoint one arbitrator to represent it and PMC shall appoint one arbitrator to represent it. Both arbitrators shall select a third arbitrator and any decision by majority vote shall be binding on both parties to any dispute. In the event the two arbitrators cannot agree on a third arbitrator acceptable to both, the President of the American Arbitration Association shall appoint said third arbitrator. Any judgment or award rendered by such panel shall be entered in any court of competent jurisdiction in the State of New York.
 
 
 [4]
 Jurisdiction was based on diversity of citizenship and § 10 of the Arbitration Act, 9 U.S.C. § 10. In addition to the allegations noted in the text, NBC also charged that Judge Dollinger was disqualified because some years earlier he had sat on a motion in a matrimonial action involving Mr. Ludwig. Judge Brieant, to whom this case was originally assigned, held that the association was too insubstantial to support an attack on the award, and NBC has not appealed this determination
 
 
 [5]
 PMC had originally moved in the New York state courts to confirm the award, but it discontinued that action and agreed to proceed solely in the federal forum
 
 
 [6]
 On appeal, NBC has dropped its contention that Weicholz acted improperly in referring to Mr. Ludwig's wealth
 
 
 [7]
 Paragraph 3 of the licensing rider to the March 1, 1976, agreement between NBC and PMC forbade NBC from unreasonably refusing to grant licenses to prospects located by PMC
 
 
 [8]
 To the extent the settlement offer was relevant at all, it was relevant only on the issue of liability. The arbitration contained evidence that officials of NBC had twice considered buying Sommer out before they terminated the March 1 agreement, and PMC argued vigorously before the arbitrators that this demonstrated that NBC had breached solely as a matter of business judgment, and not for cause
 
 
 [9]
 Little v. Newton, 133 Eng.Rep. 781 (C.P.1841), cited by NBC, is therefore inapposite. In Little, the arbitrators agreed that resolution of the dispute before them depended on a particular issue of law. The two partisan arbitrators in Little were commercial men, with no legal expertise, and they agreed to defer to the neutral arbitrator, a barrister. The barrister asked for some time to consider the matter. When he reached his conclusion, he drafted and signed an award, which was forwarded to the arbitrator for the winning side, who also signed. The Court of Common Pleas held correctly, no doubt that the partisan arbitrators were required to exercise their own independent judgment as to the controlling issue, and that the award was therefore void. Judge Dollinger, however, had brought his reasoning powers to bear on the problem confronting him and concluded that $2 million was a reasonable award. That he also believed lesser amounts were supportable did not require him to prolong the deliberations once it appeared that PMC's arbitrator would agree to a sum within his range and NBC's would not
 
 
 [10]
 This settlement was vetoed by Mr. Ludwig. NBC makes much of the fact that no offer was ever transmitted to Sommer by an NBC official who actually had authority to settle, but this answers nothing. The fact remains that the arbitration record did contain references to settlement discussions, whether authorized or not
 
 
 [11]
 Although the lack of evidentiary support for this part of Weicholz's statement is conceded, it is not an ineluctable conclusion that the PMC arbitrator was referring to matters outside the record. Sommer was a resident of Bermuda, and it would hardly be astonishing if Weicholz, an experienced and knowledgeable attorney, had interpolated the tax consequences of this fact into his recollection of the settlement negotiations
 
 
 [12]
 See note 8 Supra
 
 
 [13]
 There is one remaining issue to be resolved. While the arbitration was proceeding in New York, Westgate, the Waikoloa developer, filed a breach-of-contract suit against both NBC and PMC in the federal district court in Hawaii. Fearing that PMC would be judgment proof, Westgate moved to attach the arbitration award and, in April 1978, a prejudgment garnishment was issued directing that the first $1.25 million of any payments made pursuant to the award be deposited with the Clerk of the Hawaii court
 In July, Westgate secured an increase in the garnishment to the full $2 million of the award, and it immediately moved to intervene in the New York proceedings to defend the award. Asserting that the garnishment constituted an "interest" in the award within the meaning of Fed.R.Civ.P. 24(a)(2), it requested intervention as of right. It feared that PMC would conclude that any money it collected in New York it would lose in Hawaii, and would therefore not defend the award as vigorously as it should. In addition, Westgate was concerned lest NBC and PMC settle for substantially less than $2 million, thereby vitiating the effect of the garnishment.
 Judge Sand denied the motion to intervene, but he did grant Westgate ample protection, including the right to attend hearings, file papers, and receive five days' advance notice of any settlement. Westgate appealed the denial of its motion, and its appeal was argued with the main appeal in this case.
 We need not reach the merits of Westgate's appeal. We believe that our affirmance on the main appeal renders the intervention issue moot. The terms of Judge Sand's final judgment confirming the award provide complete protection for the proposed intervenors. The judgment forbids execution in a manner inconsistent with the garnishment order of the Hawaiian court. As amended, that order provides:
 National Bulk Carriers, Inc. shall not, either voluntarily or involuntarily, make payment of any amount or amounts presently owed or to be owed in the future to defendant Princess Management Company, Limited. Any such payment, including that of any amount due under an award in Case No. 1310-0802-76, In the Matter of the Arbitration Between Princess Management Company, Limited, Claimant, and National Bulk Carriers, Inc., Respondent, and Walter Sommer, Impleaded Respondent, pursuant to a final judgment, all appellate process then being exhausted, shall, instead, be made to the Clerk of this Court, to be deposited in such manner as all parties hereto agree, or, in the absence of such agreement, in a manner to be directed by the Court. Notwithstanding any of the foregoing provisions, defendant National Bulk Carriers, Inc. may make such voluntary or involuntary payments to defendant Princess Management Company, Limited provided that, subject to further order of this Court, defendant National Bulk Carriers, Inc. shall pay the first $2,000,000.00 (or such greater or lesser sum as the Court may, on further motion, order) of any such payment to the Clerk of this Court.
 Westgate does not require greater protection than this, and intervention in an action that is now terminated could not afford any. Accordingly, Westgate's appeal is dismissed as moot.